# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

DESMOND RENARD                              CIV. ACTION NO. 3:21-00202 SEC. P

VERSUS                                      JUDGE TERRY A. DOUGHTY

TENSAS PARISH DETENTION                     MAG. JUDGE KAYLA D. MCCLUSKY
CENTER, ET AL.

### REPORT AND RECOMMENDATION

Before the undersigned magistrate judge, on reference from the District Court, are two motions for summary judgment filed by each remaining Defendant:   "Janna Chauvin, NP" [doc. # 20] and "Nurse Frazier" [doc. # 29] seeking dismissal of Plaintiff's claims against them.   The motions are opposed.   For reasons set forth below, it is recommended that the motions for summary judgment be GRANTED, and that Plaintiff's federal law claims against said Defendants be dismissed with prejudice and that any state law claims be DISMISSED, without prejudice.

### Background

Plaintiff pro se Desmond Renard, who is proceeding in forma pauperis in this matter, filed the instant civil rights complaint pursuant to 42 U.S.C. § 1983 on January 20, 2021, against the following Defendants:   Tensas Parish Detention Center; Sheriff Rikey Jones; Warden Pat Smith; Assistant Warden Nolen Bass, Jr.; Nurse Frazier; and Janna Chauvin, NP (incorrectly sued as "Doctor Janna Chauvin").   Pursuant to court order, Renard filed an amended complaint on March 11, 2021.   [doc. #s 7 & 9].

Renard, who, during the relevant period, was a Department of Corrections inmate housed at the Tensas Parish Detention Center ("TPDC"), at Waterproof, Louisiana, complains that on October 5, 2020, he slipped and fell on the facility's wet bathroom floor.   (Compl.).   As he fell,

he hit his head and/or neck on the stall wall, before ultimately coming to rest on his back.   After the fall, Renard experienced excruciating pain in his head, neck, and back.   *Id*.   Accordingly, he immediately wrote to medical to be seen by TPDC medical personnel, but was not seen by the "doctor," Janna Chauvin, until one week later.   *Id*.   Chauvin ordered x-rays to be taken, which were obtained two to three weeks later at the Franklin Medical Center, Winnsboro, Louisiana. *Id*.   However, Renard never heard anything further about his medical condition, despite engaging in a "continuous" medical request writing campaign.   *Id*.   Eventually, Nurse Frazier called him into the medical office and advised him that he had something called "joint gen jotis," but that she did not know what that was.   *Id*.   Frazier also did not know why the "doctor" had not prescribed anything for pain.   *Id*.   In his request for relief, Renard asked the court to look into these matters for purposes of other inmates, and also to award compensation for his past and future medical costs.   *Id*.

In his amended complaint, Renard alleged, in pertinent part, that during the time that he waited to go to the hospital to obtain x-rays, he remained in excruciating pain.   (Amend. Compl. [doc. # 9]).   He asserted that Nurse Frazier received medical requests and complaints from him and ignored them for weeks at a time.   *Id*.   As the months passed, he still received no response. *Id*.

On February 22, 2021, Renard finally received some "outside help" with contacting Nurse Frazier at the TPDC.   *Id*.   Nurse Frazier informed Renard that she had received all eighteen of his medical requests and that she had scheduled him to see "Doctor" Janna Chauvin. *Id*.

Upon seeing Chauvin, Renard learned that the x-rays did not show any signs of swelling or broken or misplaced bones.   *Id*.   Chauvin told Renard that she had prescribed some pain medication and ordered another x-ray.   *Id*.   As of March 7, 2021, however, Renard stated that

2

he had not received any pain medication and had not returned to the hospital.  *Id*.  Renard added that he did not receive a response concerning his injuries from the time he went to the hospital until his next meeting with Nurse Frazier and NP Janna Chauvin on February 22, 2021. *Id*.

Renard holds Nurse Frazier responsible for ignoring his complaints and for failing to answer his medical requests.  *Id*.  He reiterated that he had not received any medication for his injuries.  *Id*.  In his request for relief, Renard asked the court to make medical appointments for him so he could receive proper medical care for the injuries that he sustained from the slip and fall incident.  *Id*.  He also seeks $200,000 for physical damages, medical costs, and all future pain and/or doctor's visits as a result of the fall on October 5, 2020.  *Id*.

On March 15, 2021, the undersigned issued a report recommending that, except for his claims against Nurse Frazier and NP Chauvin for inadequate medical care, all of Renard's other claims against them, plus all other Defendants be dismissed as frivolous and for failing to state a claim upon which relief can be granted.  (March 15, 2021 R&R [doc. # 10]).[1]  The court contemporaneously ordered service on remaining Defendants, Nurse Frazier and Janna Chauvin, NP.  (March 15, 2021 Mem. Order [doc. # 11]).

On May 10 and 19, 2021, respectively, remaining Defendants, Frazier and Chauvin, filed responsive pleadings.  *See* Answers [doc. #s 16-17].  On May 28, 2021, Frazier filed a copy of Renard's TPDC inmate medical file in the court record, under seal.  [doc. # 19].

On August 10 and September 21, 2021, respectively, Defendants Chauvin and Frazier filed the instant motions for summary judgment seeking dismissal of Renard's remaining claims

---

[1] The District Court adopted the report and recommendation on March 25, 2021.  (Judgment [doc. # 14]).

for inadequate medical care.

On October 15, 2021, the Clerk of Court dismissed the case because of Renard's failure to apprise the court of a change of mailing address.   (Order [doc. # 34]).

On January 10, 2022, Renard reappeared in this matter and explained that, on July 23, 2021, he had had been transferred from the TPDC to Dixon Correctional Institution.   [doc. # 36].   Accordingly, he wished to file an out-of-time appeal.   *Id*.   The court construed Renard's motion as a request to reopen/reinstate the case and granted the motion.   (Jan. 12, 2022 Order [doc. # 37]).   The court directed Renard to file a response to the pending motions by January 26, 2022.   *Id*.

On January 26, 2022, Renard filed a response to the pending motions wherein he stated that he had never received copies of the motion.   [doc. # 38].   Frazier and Chauvin filed replies, wherein they agreed to supply Renard with copies of their motions for summary judgment. [doc. #s 39-40].   In light of this development, the court issued a new notice of motion setting that accorded Renard until March 15, 2022, within which to file a response to the actual arguments raised by Frazier and Chauvin in their motions.   *See* 2nd Notice of Motion Setting [doc. # 41].

On March 16, 2022, the court received Renard's response to Frazier's motion for summary judgment in which he restated many of his same allegations against her.   (Pl. Response [doc. # 42]).[2]   This time, however, Renard recounted that he asked Nurse Frazier about his x-ray results while in the hallway in December 2020.   *Id*.   Two weeks after this

---

[2] Renard's submission was timely because under the prison mailbox rule, a prisoner's pleading is deemed to have been filed on the date that the pro se prisoner submits the pleading to prison authorities for mailing.   *Harris v. Doe*, Civ. Action No. 18-638, 2019 WL 5739062, at *3 (N.D. Tex. Nov. 5, 2019) (collecting cases).   Consequently, unless the USPS has same day delivery for mail sent to Shreveport from Jackson, Louisiana, Renard necessarily submitted his response to prison authorities prior to March 16.   *See* Envelope [doc. # 42-3].

conversation, he wrote a medical request complaining that he still was experiencing extensive pain and had not spoken to anyone since taking x-rays at the Franklin Medical Center on October 28, 2020. *Id.* Renard emphasized that the eighteen medical requests Nurse Frazier had failed to answer do not appear in his medical records. *Id.* He questioned whether Frazier was the person responsible for altering or losing his medical files. *Id.* He added that he wrote grievances regarding these matters, but never received any response. *Id.* Renard denied that he ever returned to Franklin Medical Center for a second x-ray. *Id.* He asked the court to obtain his medical records from Franklin Medical Center for him. *Id.*

Renard contends that Frazier intentionally ignored his medical requests and denied him active medical care concerning his injuries. *Id.* Renard emphasized that he still is taking "pain medicine today and every day since being prescribed by 'NP- Janna Chauvin . . .'" *Id.* Finally, he attached copies of portions of his medical record and annotated them. *Id.*, Exh.

Chauvin and Frazier filed reply briefs on March 16 and 23, 2022, respectively. [doc. #s 43-44]. Accordingly, the matter is ripe.

### Summary Judgment Standard

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-323. The non-moving party may not rely merely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence. *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the

nonmovant.'" *Little, supra* (citation omitted) (emphasis in original).   In sum, "[a]fter the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted."   *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citation omitted).

Finally, when a movant bears the burden of proof on an issue, she must establish "beyond peradventure[3] all of the essential elements of the claim . . . to warrant judgment in h[er] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).   In other words, the movant must affirmatively establish her right to prevail as a matter of law.   *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

## Analysis

Frazier seeks dismissal of Renard's federal claims on two grounds:   1) because Renard purportedly failed to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA") before filing suit; and 2) because his allegations do not rise to the level of a constitutional violation.

Chauvin seeks dismissal of Renard's federal claims because:   1) she is not a state actor under § 1983; and 2) his allegations do not establish that she was deliberately indifferent to his serious medical needs, as required to state a constitutional claim.   Chauvin also raised qualified immunity as a defense to his § 1983 claim.

Insofar as Renard endeavored to bring state law claims for medical practice against Chauvin, she urged dismissal of those claims as premature because he failed to exhaust administrative remedies under the Louisiana Medical Malpractice Act.   Finally, in the event that the court were to dismiss Renard's federal law claims, Chauvin stated that the court would lack

---

[3]   I.e., beyond doubt.

original jurisdiction, which precluded it from exercising supplemental jurisdiction over any remaining state law claims.

The court first will address the threshold issue of administrative exhaustion under the PLRA before turning to the merits of Renard's § 1983 claim. Finally, the court will discuss the disposition of any remaining state law claims.

## I.    Exhaustion under the PLRA

Pursuant to 42 U.S.C. § 1997e, as amended by the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and is required even where the relief sought cannot be granted by the administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S.Ct. 2378, 2382-83 (2006) (citations omitted). All "available" remedies must be exhausted, whether speedy and effective, or not. *Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002). "Proper exhaustion requires that the prisoner not only pursue all available avenues of relief but also comply with all administrative deadlines and procedural rules." *Johnson v. Kukua*, 342 Fed. App'x. 933, 934 (5th Cir. 2009) (citing *Woodford, supra*). An untimely or otherwise procedurally defective administrative grievance does not satisfy the exhaustion requirement. *Id*.

Exhaustion is an affirmative defense; therefore, the burden is on defendant to establish that plaintiff failed to exhaust available administrative remedies. *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010).

Under Louisiana law, the Department of Public Safety and Corrections ("DOC") and each sheriff is authorized to adopt an administrative remedy procedure at each of their

8

institutions.   LA. R.S. § 15:1171.   The administrative remedy procedure is intended to resolve complaints and grievances that arise while the offender is in the custody of, or under the supervision of, the department or sheriff.   *Id*.   The procedure encompasses complaints and grievances for monetary, injunctive, declaratory, or other relief stemming *inter alia* from conditions of confinement, personal injuries, and medical malpractice.   *Id*.   These administrative procedures, when promulgated, provide the offender's exclusive remedy – to the extent that federal law permits.   *Id*.

Here, Frazier has not adduced any evidence to show that there was an administrative remedy procedure in place at the TPDC, or what steps it entailed.   To the extent that the unarticulated procedure existed, Renard stated that he filed a grievance, but never received a response.   *See* Compl.

In 2016, the Supreme Court explained that "[u]nder § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies:   An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones."   *Ross v. Blake*, 578 U.S. 632, 136 S.Ct. 1850, 1858 (2016).   Here, Frazier had not established beyond peradventure that the TPDC had an available remedy that Renard failed to exhaust.   Accordingly, her PLRA exhaustion defense fails.   *See Burnette v. Bureau of Prisons*, 2009 WL 1650072, *3 (W.D. La. June 10, 2009) (exhaustion defense not established by unsupported allegations).

## II.     Section 1983

a)     <u>General Principles and State Action Requirement</u>

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the

9

party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."
*Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citing 42 U.S.C. § 1983).   Section
1983, however, does not create any substantive rights; it simply provides a remedy for the rights
designated therein.   *Id*.   "Thus, an underlying constitutional or statutory violation is a predicate
to liability under § 1983."   *Id*.   (citation omitted).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right
secured by the Constitution and laws of the United States, and must show that the alleged
deprivation was committed by a person acting under color of state law."   *Cornish v.*
*Correctional Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005).   To constitute state action two
requirements must be met:   1) "the deprivation must be caused by the exercise of some right or
privilege created by the State . . . or by a person for whom the State is responsible," and 2) "the
party charged with the deprivation must be a person who may fairly be said to be a state actor."
*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n.18 (1982).   Traditionally, "acting under color
of state law requires that the defendant in a § 1983 action have exercised power 'possessed by
virtue of state law and made possible only because the wrongdoer is clothed with the authority of
state law.'"   *West v. Atkins*, 487 U.S. 42, 49 (1988) (citing *United States v. Classic*, 313 U.S.
299, 326 (1941)).

Chauvin's arguments notwithstanding, the Supreme Court plainly has held that a medical
professional employed by the State to provide medical services to state prison inmates acts under
color of state law for purposes of § 1983 when undertaking her duties to treat an inmate's
injuries.   *West v. Atkins*, 487 U.S. 42; 108 S.Ct. 2250, 22580 (1988).   Moreover, the fact that
the State employs the medical professional pursuant to a contractual arrangement that does not

generate the same benefits or obligations applicable to other "state employees" does not alter the analysis. *Id*. "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Id*.

As a nurse practitioner with whom the State contracted to treat Renard, Chauvin is a state actor for purposes of the instant § 1983 claim.

b)    <u>Qualified Immunity</u>

When, at least in part here, a plaintiff seeks money damages from government officials in their individual capacities under § 1983, the affirmative defense of qualified immunity is available to protect defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). The qualified immunity doctrine balances two often conflicting interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. As such, "[t]he protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citations omitted). In effect, qualified immunity "gives ample room for mistaken judgments by protecting "all but the plainly incompetent or those who knowingly violate the law." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (citing *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092 (1986) (internal quotation marks omitted).

Qualified immunity is nominally characterized as an affirmative defense.   However, once raised by defendants, it devolves upon plaintiff to negate the defense by showing that the officials' conduct violated clearly established law.   *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation omitted).   Plaintiff's burden is two-pronged.   *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (quoted sources omitted).   First, plaintiff must demonstrate that defendant(s) violated a constitutional right under current law.   *Id*.   "Second, [plaintiff] must claim that the defendant[s'] actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."   *Id*.   (quoted source and internal quotation marks omitted).   The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."   *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citation omitted).

In the peculiar context of a motion for summary judgment, "once [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [an officer's] actions . . . is a pure question of law."   *Scott v. Harris*, 550 U.S. 372, 397, 127 S.Ct. 1769, 1776 n.8 (2007). Consequently, the Fifth Circuit has recognized that,

> when facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably, we can hold that an officer acted reasonably as a matter of law.   But when facts are disputed and significant factual gaps remain that require the court to draw several plaintiff-favorable inferences, our analysis is more tentative.   In these cases, we must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff.

*Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411–12 (5th Cir. 2009) (internal citation omitted).

In other words, there is no constitutional violation if – even after crediting the version of facts most favorable to plaintiff – the officer's conduct was objectively reasonable.  *Id.*

"A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when h[er] conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'"  *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) (citations omitted).  Thus, to establish liability for inadequate medical care under the Eighth Amendment, an inmate must adduce facts which "clearly evince" a serious medical need and the prison official's deliberate indifference to it. *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).

A plaintiff "must demonstrate that a government official was deliberately indifferent to 'a substantial risk of serious medical harm.'"  *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 330 (5th Cir. 2016) (quoting *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)).  A prison official acts with deliberate indifference to an inmate's health "only if [s]he knows that [the] inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) (applying *Farmer* to a denial of medical care claim).

A plaintiff must establish that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).  "[N]either an incorrect diagnosis nor the failure to alleviate a

significant risk that should have been perceived, but was not, is sufficient to establish deliberate indifference." *Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016). "Thus, mere disagreement with one's medical treatment is insufficient to show deliberate indifference, as are claims based on unsuccessful medical treatment, negligence, or medical malpractice." *Delaughter v. Woodall*, 909 F.3d at 136 (citations omitted). Moreover, "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Continuous medical care ordinarily precludes a finding of deliberate indifference on the part of prison officials. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Mayweather v. Foti,* 958 F.2d. 91 (5th Cir. 1992).

In short, "[d]eliberate indifference is an extremely high standard to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *see Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference."); *Domino, supra* (quoting *Farmer, supra*) ("[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'").

c)    Evidence Presented

On October 8, 2020, Renard was seen by NP Chauvin for neck and lumbar back pain, with range of motion, following an October 5, 2020 slip and fall in the bathroom. (Visit note [doc. # 19-1, pg. 44]). Chauvin noted that Renard had diffuse tenderness to all muscles of the lower back. *Id*. He reported pain with range of motion to lumbar and cervical areas. *Id*. Chauvin diagnosed, *inter alia*, neck and back pain, and prescribed Flexeril, twice per day for

14

seven days, and then as needed for spasms for one month.  *Id*.  She also ordered a Kenalog

injection, 800 mg. Ibuprofen 3x/day for pain for one month, and x-rays of the cervical spine.  *Id*.

An October 28, 2020, x-ray of the cervical spine showed no evidence of acute fractures,

but, the radiologist indicated that, if clinically warranted, an MRI should be considered for

further evaluation.  (Final Report [doc. # 19-1, pg. 53]).  The radiologist further indicated that

there was mild loss of disc height at C4-C5 and C5-6 associated with prevertebral spondylosis.

*Id*.  NP Chauvin handwrote "DJD of neck," (i.e., degenerative joint disease) on the report.  *Id*.

On November 2, 2020, Nurse Frazier documented that the x-ray results had been received

and that Renard had been diagnosed with "DJD."  (Nurse's Notes [doc. # 19-1, pg. 59]).  She

also wrote "NNO", i.e., that there were no new orders at that time.  *Id*.

Renard's medication distribution records indicate that in December 2020, he received

Zyrtec, Cozaar, Norvasc, Elavil, propranolol, hydroxyzine, Zyprexa, and 800 mg. Ibuprofen, at

least once every day.  (Medication Admin. Record [doc. # 19-1, pgs. 23-24]).

On December 13, 2020, Renard completed two medical request forms.  The first request

was because he needed a refill of his Lubriderm lotion after it had been lost.  (Detainee/Offender

Request Form [doc. # 19-1, pg. 28]).  *Id*.  On the second request form, Renard noted that x-rays

had been taken of his neck, but he had never received a response or a follow-up with the doctor.

(Detainee/Offender Request Form [doc. # 19-1, pg. 29]).  He explained that his neck was still

"sore" and that his back hurt "sometimes."  *Id*.  He concluded that he needed to see the doctor

again concerning these matters.  *Id*.

Nurse Frazier saw Renard one week later on December 21, 2020.  (Nurse's Notes [doc. #

19-1, pg. 58]).  She indicated that Renard presented with multiple complaints.  *Id*.  His lotion

15

was reordered, and medicated powder was given.   *Id*.   He was to return to medical if his condition worsened.   *Id*.

According to Nurse Frazier, she referred Renard for a second cervical spine x-ray at the Franklin Medical Center on December 28, 2020.   (Frazier-Barnett Declaration; MSJ, Exh. A [doc. # 29-3]).   She added that she again referred Renard to be seen by NP Chauvin.   *Id*.

Renard's medical record includes a DOC form indicating that he was admitted to Franklin Medical Center on December 28, 2020, for purposes of obtaining x-rays of the cervical spine.   (Offender Ver. Form for Hospital Admissions [doc. # 19-1, pg. 31]).   However, no results of the alleged second cervical x-ray appear in Renard's medical record.

On January 27, 2021, Renard returned to NP Chauvin for complaints of lower back pain, with spasms, and a rash between his toes.   (Visit note [doc. # 19-1, pg. 57]).   Chauvin assessed Renard with muscle spasms and athlete's foot.   *Id*.   She prescribed ketoconazole, Flexeril, and Prednisone.   *Id*.

On April 28, 2021, NP Chauvin saw Renard again for complaints of continued pain to his lower back, but that his spasms had improved with Flexeril.   (Visit note [doc. # 19-1, pg. 54]).   Chauvin noted, *inter alia*, that Renard had lumbar back pain and neck pain with range of motion, with history of cervical degenerative disc disease.   *Id*.   She prescribed Diclofenac, aspercreme, a bottom bunk pass, and a neurological referral pending DOC approval.   *Id*.

Chauvin also completed a form requesting a neurological referral for Renard.   (Specialty Referral Form [doc. # 19-1, pg. 56]).   She noted that he had abnormal x-rays, with complaints of pain even after treatment.   *Id*.   She diagnosed degenerative joint disease.   *Id*.

Nurse Frazier declared that because Renard was a DOC inmate, "all non-emergent

16

outside medical appointments . . . had to be submitted to and approved through [DOC's] e-Ceptionist system before they could be scheduled.   (Frazier Barnett Declaration, *supra*).

For his part, Renard contends that his medical record is incomplete because he submitted eighteen medical requests between October and December 2020 that are missing.   In addition, he states that he never returned to Franklin Medical Center for a second set of cervical x-rays. For purposes of these summary judgment motions, the court will construe these disputed issues of fact in his favor.   Ultimately, however, these disputed issues are not material.  *See* discussion, *infra*.

d)    Discussion

The record confirms that between October 8, 2020, and April 28, 2021, Renard was seen by NP Chauvin on three occasions.[4]   Chauvin first saw Renard for his neck and back pain three days after the slip and fall, whereupon she ordered a Kenalog injection, Flexeril, Ibuprofen, and cervical x-rays.   The x-rays were taken on October 28, 2020, and revealed no acute injury. Consequently, no further medical orders were issued at that time.   Apparently, however, no one advised Renard about the x-ray results, which left him to speculate about his condition for one and one-half months until he was seen by Nurse Frazier.   According to Renard, however, his meeting with Nurse Frazier did not allay his concerns because she did not know what his diagnosis meant.

Over one month later, Renard returned to NP Chauvin with complaints of lower back pain, for which she prescribed medication.   Renard again saw NP Chauvin three-months later,

---

[4] Chauvin saw Renard on other occasions prior to the slip and fall that are not relevant to his neck and back pain.

whereupon she prescribed additional medication and referred Renard for a consultation with a neurologist.   No further treatment notes appear in Renard's medical record, and he was transferred out of TPDC three months later on July 23, 2021.[5]

The record confirms Renard's concern that his medical visits for his neck and lumbar back pain have been relatively sparse.   On the other hand, the October 28, 2020 cervical x-ray did not reveal any acute abnormalities associated with sudden trauma that required immediate intervention.   Furthermore, Renard's protestations notwithstanding, Nurse Frazier did not completely ignore his complaints, as she scheduled him for at least three visits over a six-month period with NP Chauvin.   When Renard was seen by NP Chauvin, as early as three days after the slip and fall, she prescribed medication to help alleviate his symptoms.

Initially in this case, Renard alleged that he had received no medication for his injuries. However, in response to the motions for summary judgment, he acknowledged that he "still" takes pain medication ever since it was prescribed by NP Chauvin.   In other words, even after Renard was transferred to a new facility, that undoubtedly is staffed by different medical providers, his course of treatment has remained consistent.   In fact, some eight months after his transfer out of the TPDC, Renard has not adduced any medical evidence to show that he was treated by any other medical provider or, if he has been seen, that the provider diagnosed any condition or prescribed any course of treatment that materially differed from what was offered by

---

[5] According to Nurse Frazier, Exhibit 19 includes only Renard's TPDC medical records through January 2021.   (Frazier Declaration).   This statement is not entirely correct because Exhibit 19 also includes Renard's April 28, 2021, visit with NP Chauvin.   Nonetheless, because the record was filed with this court on May 28, 2021, it necessarily does not include any treatment records after that date.

NP Chauvin and Nurse Frazier.[6]   In the absence of such evidence, the court cannot fault NP

Chauvin, or, by extension, Nurse Frazier, for the treatment that they provided.[7]   In the court's

own experience, exacerbation of neck and back pain often resolves over time.   In Renard's case,

his symptoms did not completely dissipate, and NP Chauvin eventually referred him for a

"neuro" consult.

In the end, the fact that Renard does not believe that his medical treatment was as swift or

comprehensive as it could have been is not a cognizable complaint under the Civil Rights Act.

Prisoners are not entitled to the "best medical care money can buy."   *See Mayweather, supra*

(continuing back pain, while unpleasant, does not demonstrate a constitutional violation);

*Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981); *Barrett v. Mississippi Dept. of Corrections*, 427

Fed. App'x. 349 (5th Cir. 2011) (inmate's argument that medical staff did not use the most

efficacious method of treatment, e.g., performing surgery earlier, does not establish a claim of

deliberate indifference) (citation omitted); *Haddix v. Kerss,* 203 Fed. App'x. 551, 553 (5th Cir.

2006) (occasional denial of pain medication for preexisting back pain does not show worsening

of condition or other serious harm); *Stockwell v. Kanan*, 442 Fed. App'x. 911, 914 (5th Cir.

---

[6] In his response brief, Renard asked the court to assist him with obtaining his medical records from the Franklin Medical Center.   However, Renard has not explained what those records will establish if, as he contends, he did not return to the Franklin Parish Medical Center. Furthermore, by law, Renard may obtain a copy of his own medical records without resort to a court order – provided he furnishes a signed authorization and reasonable copying charges to the medical provider.   *See* LA. R. S. § 40:1165.1.   In any event, discovery has been closed in this case since approximately August 10, 2021.   *See* Mem. Order [doc. # 11] (setting discovery deadline).

[7] Recall that in his December 13, 2020 medical request form, Renard stated only that his neck was still "sore," and that his back hurt "sometimes."   While such complaints warranted further work up, they did not suggest serious impairment necessitating immediate or extraordinary intervention.

2011) (continuing back pain does not constitute a constitutional violation when the deficiencies in care are minimal).   Based on the evidence of record, no reasonable trier of fact could return a verdict in favor of Renard finding that either Chauvin or Frazier were deliberately indifferent to a substantial risk of serious medical harm faced by him.   Accordingly, Chauvin and Frazier are entitled to summary judgment.   *See Anderson, supra* (to survive defendant's motion for summary judgment, plaintiff need present evidence from which the trier of fact might return a verdict in his favor).[8]

Furthermore, from the Complaint, as amended, it appears that the primary relief that Renard was seeking for his claim for inadequate medical care against Chauvin and Frazier was to receive proper medical care for his condition.   However, in July 2021, Renard was transferred out of the TPDC and sent to another facility.   Accordingly, his request for relief is moot.   *See Cooper v. Thomas*, 101 F. App'x 983, 984 (5th Cir. 2004) ("Cooper's request for a medical examination and chest x-ray became moot upon his transfer to the state penitentiary."); *Lee v. Richland Par. Det. Ctr.*, 483 F. App'x 904 (5th Cir. 2012) (affirming the finding, in an action against a warden and medical staff, that the detainee's request for injunctive relief concerning denial of medical care was moot because the detainee was no longer housed at the detention center).

The court is not unmoved by Renard's plight and notes that he also asserted a claim for monetary damages as a result of the injuries he suffered in the slip and fall accident.   However,

---

[8]   Having determined that Renard failed to adduce sufficient evidence to support a claim for inadequate medical care, the court need not determine whether any such right was clearly established in 2020-2021.   Case law, however, confirms that it was.   *See Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006).

the slip and fall cause of action represents a state law tort claim, which he may pursue in state court.   *See* discussion*, infra*.

### III.    State Law Claims

When, as recommended here, all claims which conferred federal subject matter jurisdiction are dismissed, the court may decline to exercise supplemental jurisdiction over the remaining state law claims.   28 U.S.C. § 1367(c)(3).   In fact, this is the general rule.   *Priester v. Lowndes County*, 354 F.3d 414, 425 (5th Cir. 2004) (citation omitted).   The twin interests of comity and efficiency dictate that any remaining state law claims be dismissed without prejudice. 28 U.S.C. § 1367(c).[9]

### Conclusion

For the above-assigned reasons,

IT IS RECOMMENDED that the motions for summary judgment filed by Defendants "Janna Chauvin, NP" [doc. # 20] and "Nurse Frazier" [doc. # 29] be GRANTED-IN-PART and that Plaintiff Desmond Renard's claims against said Defendants arising under the laws and Constitution of the United States be DISMISSED, with prejudice.

IT IS FURTHER RECOMMENDED that the motions for summary judgment [doc. #s 20 & 29] otherwise are DENIED, and instead that Plaintiff's state law claims, if any, against all Defendants be DISMISSED, without prejudice.   28 U.S.C. § 1367(c).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific,

---

[9]   The limitations period is tolled for a minimum of 30 days after dismissal.   *See* 28 U.S.C. § 1367(d).

written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

In Chambers, at Monroe, Louisiana, on this 13th day of June, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

22